
FILED
April 20, 2015
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-14-00713-CV
4960817
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/20/2015 5:07:17 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00713-CV

# In the Court of Appeals for the Third Judicial District Austin, Texas

---

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,
*Appellants,*

v.

CGG VERITAS SERVICES (U.S.), INC.,
*Appellee.*

---

On Appeal from the
353rd Judicial District Court of Travis County, Texas

---

## APPELLANTS' BRIEF

---

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
General

SCOTT A. KELLER
Solicitor General

APRIL L. FARRIS
Assistant Solicitor General
State Bar No. 24069702

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-2923
Fax: (512) 474-2697
april.farris@texasattorneygeneral.gov

**Oral Argument Requested**    COUNSEL FOR APPELLANTS

## IDENTITY OF PARTIES AND COUNSEL

*Appellants*
Glenn Hegar, Comptroller of Public Accounts of the State of Texas,
Ken Paxton, Attorney General of Texas

*Lead Appellate Counsel*
April L. Farris
Assistant Solicitor General
State Bar No. 24069702
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-2923
april.farris@texasattorneygeneral.gov

*Additional Appellate and
Trial Counsel*
Charles K. Eldred
Assistant Attorney General
State Bar No. 00793681
P.O. Box 12548 MC 017-6
Austin, Texas 78711-2548
Tel.: (512) 475-2301
charles.eldred@
texasattorneygeneral.gov

*Appellee*
CGG Veritas Services (U.S.), Inc.

*Lead Appellate Counsel*
Amanda Taylor
State Bar No. 24045921
James F. Martens
State Bar No. 13050720
Lacy Leonard
State Bar No. 24040561
MARTENS TODD LEONARD & TAYLOR
301 Congress Ave., Suite 1950
Austin, Texas 78701
Tel.: (512) 542-9898
Fax: (512) 542-9899
ataylor@textaxlaw.com
jmartens@textaxlaw.com
lleonard@textaxlaw.com

*Additional Appellate and
Trial Counsel*
Stacie L. Bennett
State Bar No. 2476984
Danielle V. Ahlrich
State Bar No. 24059215
MARTENS TODD LEONARD &
TAYLOR
301 Congress Ave., Suite 1950
Austin, Texas 78701

ii

# TABLE OF CONTENTS

Identity of Parties and Counsel ............................................................ iii

Index of Authorities.............................................................................v

Statement of the Case ........................................................................ix

Statement Regarding Oral Argument .....................................................x

Issues Presented..............................................................................xii

Introduction .....................................................................................1

Statement of Facts ............................................................................1

    I.     The Tax Code's Framework for Calculating the Cost of Goods Sold and the Franchise Tax .........................................1

    II.    CGG Veritas's Business Model ..............................................5

    III.   CGG's 2008 Franchise Tax Filing and Lawsuit ...................11

Summary of Argument.....................................................................15

Standard of Review ........................................................................20

Argument.......................................................................................21

    I.     The District Court Misinterpreted Either the Law or the Legal Standard in Ruling that CGG Veritas's Costs Qualify for the COGS Deduction. .......................................21

    II.    CGG Veritas's Business Costs Are Not Eligible for the COGS Deduction Pursuant to Tax Code § 171.1012(a)(1) .........................................................25

         A.    The District Court Found that CGG Veritas Provides "Services," But Erroneously Allowed It to Deduct the Costs of These Services under § 171.1012(a)(1). ...............................................28

B.     The District Court Erred By Failing to Interpret the Statutory Term "Intangible Property" to Include CGG Veritas's Data Products. ........................ 32

C.     CGG Veritas's Data and Services are not "Tangible Personal Property" Under §171.1012(a)(3)(A)(ii). ....... 35

III.   CGG Veritas Does Not Furnish Labor or Materials to a Project for Construction of Real Property, So Its Costs Do Not Qualify for the COGS Deduction under § 171.1012(i). ...................................................................... 41

A.     CGG Veritas Does Not Furnish "Labor" or "Materials." ............................................................... 45

B.     CGG Veritas's Services Are Too Far Removed from a "Project" for the Construction of Real Property to Qualify for the COGS Deduction under § 171.1012(i). .............................................................. 50

Prayer ............................................................................................ 52

Certificate of Service .................................................................... 54

Certificate of Compliance ............................................................. 54

iv

# INDEX OF AUTHORITIES

## Cases

*AHF-Arbors at Huntsville I, LLC v. Walker Cnty. Appraisal Dist.*,
    410 S.W.3d 831 (Tex. 2012)...................................................... 23

*Baker v. Bullock*,
    529 S.W.2d 279 (Tex. Civ. App.—Austin 1975,
    writ ref'd n.r.e.) ............................................................... 31

*Bullock v. Nat'l Bancshares Corp.*,
    584 S.W.2d 268 (Tex. 1979)............................................... 22, 23

*City of Austin, et al. v. Sw. Bell Tel. Co.*,
    92 S.W.3d 434 (Tex. 2002)............................................................ 20

*Combs v. Chevron*,
    319 S.W.3d 836 (Tex. App.—Austin 2010, no pet.) ...................... 21

*Combs v. Home & Garden Party, Ltd.*,
    No. 03-09-00673-CV, 2010 WL 4367054 (Tex. App.—Austin
    2010, no pet.) (mem. op.) ............................................................ 21

*Combs v. Newpark Res., Inc.*,
    422 S.W.3d 46 (Tex. App.—Austin 2013, no pet.) ................. *passim*

*Combs v. Roark Amusement & Vending, L.P.*,
    422 S.W.3d 632 (Tex. 2013)...................................................... 20-21

*Duvall v. Texas Dept. of Human Servs.*,
    82 S.W.3d 474 (Tex. App.—Austin 2002, no pet.) ........................ 49

*First Am. Title Ins. Co. v. Combs*,
    258 S.W.3d 627, 632 (Tex. 2008) ............................................... 21

*Fredericksburg Care Co., L.P. v. Perez*,
    13-0573, 2015 WL 1035343 (Tex. Mar. 6, 2015)........................... 20

*Geomap Co. v. Bullock*,
    691 S.W.2d 98 (Tex. App.—Austin 1985, writ refd n.r.e)..............32

*GTE Sw. Inc. v. Combs*,
    03-08-00561-CV, 2010 WL 2218662 (Tex. App.—Austin
    June 3, 2010, pet. denied) (mem. op.) ...........................................22

*Hawkins v. Dallas Cnty. Hosp. Dist.*,
    150 S.W.3d 535 (Tex. App.—Austin 2004, no pet.) ......................48

*Houston First Am. Sav. v. Musick*,
    650 S.W.2d 764 (Tex. 1983)...........................................................30

*In re Bass*,
    113 S.W.3d 735 (Tex. 2003)................................................33, 35, 38

*In re Hall*,
    286 S.W.3d 925 (Tex. 2009)...................................................39, 42

*In re Nestle USA, Inc.*,
    387 S.W.3d 610 (Tex. 2012).......................................................1, 2

*Kirby Lake Develop., LTD v. Clear Lake City Water Authority*,
    320 S.W.3d 829 (Tex. 2010) .......................................................26

*Marks v. St. Luke's Episcopal Hospital*,
    319 S.W.3d 658 (Tex. 2010)........................................................39

*N. Alamo Water Supply Corp. v. Willacy Cnty. Appraisal Dist.*,
    804 S.W.2d 894 (Tex. 1991).................................................22, 23

*Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*,
    335 S.W.3d 297 (Tex. App.—Houston [14 Dist.] 2010,
    pet. denied) ..................................................................................33

*Roark Amusement & Vending, L.P. v. Combs*,
    No. 03-10-00105-CV, 2011 WL 255535 (Tex. App.—Austin,
    Jan. 26, 2011) (mem. op.) (citation omitted), *aff'd on other*
    *grounds*, 422 S.W.3d 632 (Tex. 2013) ...........................................24

*State v. $1,760.00 in US Currency,*
     406 S.W.3d 177 (Tex. 2013) (per curiam) ......................................39

*State v. Shumake,*
     199 S.W.3d 279 (Tex. 2006).........................................................20

*Strayhorn v. Raytheon E-Sys., Inc.,*
     101 S.W.3d 558 (Tex. App.—Austin 2003, pet. denied)................23

*TGS-NOPEC Geophysical Co. v. Combs,*
     340 S.W.3d 432 (Tex. 2011)...................... 20, 27, 32, 33, 34, 35, 42

*Upjohn Co. v. Rylander,*
     38 S.W.3d 600 (Tex. App.—Austin 2000, pet. denied)..................24

**Statutes**

TEX. GOV'T CODE § 311.021(2) ..............................................................48

TEX. GOV'T CODE §§ 403.203 *et. seq.*......................................................ix

TEX. TAX CODE §§ 112.051 *et. seq.*.........................................................ix

TEX. TAX CODE § 171.101(a)(1)(B)(ii)(a)(1) ..............................................2

TEX. TAX CODE § 171.1012................................................................x, 1, 2

TEX. TAX CODE § 171.1012(a) ...............................................................25

TEX. TAX CODE § 171.1012(a)(1) ..................................................... *passim*

TEX. TAX CODE § 171.1012(a)(3)(A) .........................................................3

Tex. Tax Code § 171.1012(a)(3)(A)(ii) ............................................ *passim*

TEX. TAX CODE § 171.1012(a)(3)(B) .........................................3, 4, 29, 49

TEX. TAX CODE § 171.1012(a)(3)(B)(i)-(ii) .............................................16

TEX. TAX CODE § 171.1012(a)(3)(B)(i) ...............................................xi, 26

vii

TEX. TAX CODE § 171.1012(a)(3)(B)(ii) ........................................ xi, 26, 32

TEX. TAX CODE § 171.1012(c) ............................................... 16, 43, 44, 49

TEX. TAX CODE § 171.1012(c)(1) .................................................. xi, 44, 46

TEX. TAX CODE § 171.1012(c)(1)-(13) ................................................. 44

TEX. TAX CODE § 171.1012(c)(10) ............................................. xi, 19, 46

TEX. TAX CODE § 171.1012(c)(2) .................................................. xi, 44, 46

TEX. TAX CODE § 171.1012(c)(3) .................................................. xi, 44, 46

TEX. TAX CODE § 171.1012(d) ............................................................. 16

TEX. TAX CODE § 171.1012(e) ............................................................. 16

TEX. TAX CODE § 171.1012(i) ....................................................... *passim*

TEX. TAX. CODE § 171.1012(a)(3)(B)(i) ................................................ x, 26

## Other Authorities

MERRIAM-WEBSTER ONLINE, http://www.merriam-
       webster.com/dictionary/mass (last visited April 14, 2015) ............ 37

Ray Andrews Brown, THE LAW OF PERSONAL PROPERTY 11
       (3d ed., Walter B. Raushenbush ed. 1975) ................................ 27

Webster's Third New International Dictionary 1259 (Phillip Gove
       Ed. 2002) .................................................................................... 47

# STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case*: | CGG Veritas filed suit under Texas Tax Code §§ 112.051 *et seq*. and Texas Government Code §§ 403.203 *et. seq*. to recover tax amounts paid under protest. CR.5. At issue is the Comptroller's disallowance of CGG Veritas's cost-of-goods-sold deduction. CR.6-7, 15. |
| *Course of Proceedings*: | The district court conducted a two-day bench trial in February 2014 on the issue of whether CGG Veritas may include the costs of its seismic services and products in its cost-of-goods-sold deduction. CR.250-51. |
| *Trial Court*: | The Honorable Tim Sulak, 353rd District Court, Travis County, Texas. CR.269. |
| *Trial Court Disposition*: | CGG Veritas prevailed on both of its theories supporting its claim that it was entitled to claim a cost-of-goods-sold deduction in the amount of $567,600,223. CR.268. The district court entered judgment that it was entitled to claim a cost-of-goods-sold deduction in that amount. CR.250. The Court ordered that CGG Veritas's tax due for Report Year 2008 was $1,721,022.23, and ordered the Comptroller to issue an appropriate check including appropriate statutory interest. CR.250. |

ix

**STATEMENT REGARDING ORAL ARGUMENT**

State Defendants request oral argument because this case presents an issue of first impression regarding the proper construction of several subsections of Texas Tax Code § 171.1012. Argument would provide the opportunity to fully explore the intended meanings of these subsections.

# ISSUES PRESENTED

1. Do CGG Veritas's seismic services and products constitute "tangible personal property," so as to qualify for the cost-of-goods-sold (COGS) deduction under Texas Tax Code § 171.1012(a)(1)?

    a. CGG Veritas pleaded, and the district court found, that it provides "services." CR.7, 266. The Legislature has explicitly excluded "services" from the definition of "tangible personal property." TEX. TAX CODE § 171.1012(a)(3)(B)(ii). Did the district court err by allowing CGG Veritas to deduct the costs of these services under § 171.1012(a)(1)?

    b. The Legislature has explicitly excluded "intangible property" from the definition of "tangible personal property." § 171.1012(a)(3)(B)(i). To the extent that CGG Veritas sells products, are those products intangible property?

3. Do CGG Veritas's "geological and geophysical" products and services constitute "labor" or "materials," so as to allow CGG Veritas to be deemed an owner of its clients' goods for purposes of § 171.1012(i)? *Compare* § 171.1012(c)(10) *with* § 171.1012(c)(1), (c)(2) and (c)(3).

4. If CGG Veritas furnishes "labor" or "materials," are its activities nevertheless too far removed from an oil or gas drilling "project" to be deductible under § 171.1012(i)?

5. Is the COGS deduction a tax exemption, such that doubts regarding eligibility must be construed against the claimant?

The district court erred as a matter of law when it ruled that Appellee CGG Veritas was entitled to claim a statutory cost-of-goods-sold (COGS) deduction of $567,600,273 for franchise tax Report Year 2008.

The essential facts are undisputed. The parties are in agreement regarding what work CGG Veritas's geo-sciences business actually performs. They disagree as to what statutory label should apply to its business activities. The question whether CGG Veritas's costs meet the criteria for the COGS deduction turns on the meaning of the terms that the Legislature chose in enacting Texas Tax Code §171.1012.

## STATEMENT OF FACTS

### I. THE TAX CODE'S FRAMEWORK FOR CALCULATING THE COST OF GOODS SOLD AND THE FRANCHISE TAX

The franchise tax is a tax payment for "the value of the privilege of doing business in Texas." *In re Nestle USA, Inc.*, 387 S.W.3d 610, 612 (Tex. 2012); *see Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47 (Tex. App.—Austin 2013, no pet.). Since the 2006 restructuring of the Tax Code, the franchise tax owed by an entity has been "calculated according to the following formula":

*Total Revenue*

− *General Deduction: greater of either COGS, Compensation, or* 30%

= *Margin*

× *Percentage of gross receipts from Texas business*

= *Taxable Margin*

× *Tax Rate of .5% for entities primarily in wholesale or retail, 1% for all others*

= *Franchise Tax*

*In re Nestle USA,* 387 S.W.3d at 614-15.

At issue here is the statutory COGS deduction. TEX. TAX CODE § 171.101(a)(1)(B)(ii)(a)(1) (COGS deduction determined by subtracting from total revenue the "cost of goods sold, as determined under Section 171.1012"). Section 171.1012 of the Tax Code, entitled "Determination of Cost of Goods Sold," "allows a company to deduct all direct costs of acquiring or producing goods,' some indirect costs like insurance, utilities, and quality control, and up to 4% of other 'indirect or administrative overhead costs." *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 48 (Tex. App.—Austin 2013, no pet.). That section also defines the COGS deduction's contours and limits, and it restricts the COGS deduction's applicability in two primary ways.

First, Section 171.1012 sets hard limits on what items qualify as "goods" for purposes of the COGS deduction. Section 171.1012(a)(1) restricts the meaning of the term "goods" to only "real or tangible personal property sold in the ordinary course of business." *Id.* § 171.1012(a)(1). The term "tangible personal property," in turn, means:

(i) [p]ersonal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner;

(ii) [f]ilms, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator or any one or more third parties in a form that is not substantially altered;

(iii) a computer program, as defined by Section 151.0031.

§ 171.1012(a)(3)(A).

By contrast, § 171.1012 excludes from the definition of "tangible personal property" both "intangible property" and "services." *Id.* § 171.1012(a)(3)(B). An entity may not claim a COGS deduction for the

3

costs of producing or acquiring any intangible property or services that it sells. *Id.*

The second way in which §171.1012 restricts the COGS deduction's eligibility is by mandating that only the owners of goods may deduct the cost of any particular goods at issue. That provision dictates that

> (i) [a] taxable entity may make a subtraction under this section in relation to the cost of goods sold only if that entity owns the goods. . . .

*Id.* § 171.1012(i). Mere possession of the goods cannot confer eligibility to deduct their cost. If the taxable entity does not own the goods at issue, then that entity may not take a COGS deduction for the cost of those particular goods. *Id.*

Section 171.1012(i) recognizes three different routes by which a taxable entity may establish the requisite ownership relationship for purposes of the COGS deduction. The first route is traditional ownership, which is "based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxable entity." *Id.*

The second route is by "furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial

4

maintenance (as the term 'maintenance' is defined in 34 T.A.C. Section 3.357) of real property." *Id.* By furnishing such labor and materials, the entity may be "considered to be an owner of that labor or materials and may include the costs, as allowed by this section, in the computation of cost of goods sold." *Id.* The third route is deemed ownership of "goods being manufactured or produced by the entity under a contract with the federal government." *Id.* Only the first two paths are implicated in this case.

## II. CGG VERITAS'S BUSINESS MODEL

CGG Veritas is a geo-sciences company that performs seismic data acquisition and data processing services for clients on both a proprietary and non-proprietary basis. 2RR.117; CR.265. CGG Veritas creates and uses "sound waves" to "collect [] raw seismic data," and it then engages in sophisticated processing of that data to "produce a three-dimensional image that allows [it] to see below the surface of the earth." 2RR.77. CGG's clients consist of oil-and-gas-well exploration and production companies. CR.265; 2RR.46.

At trial, CGG Veritas's senior project manager for its multi-client data library (MCDL), Bob Montgomery, testified extensively to CGG

5

Veritas's business activities. 2RR.72. He explained that CGG Veritas acquires seismic data by creating audio recordings using tools and devices that impact the earth's surface and sub-surface. 2RR.133-34;CR.265. With such tools as dynamite, geophones, air-guns, marine vessels, and vibroseis trucks, CGG Veritas employees create a sound wave that disturbs the earth's surfaces and sub-surfaces. CR.266; 2RR.134. The company captures the effect of those disturbances as "seismic sound recordings" by "record[ing] the sound waves that are coming back up." 2RR.135, CR.265. CGG's seismic-data-acquisition services range from very small projects, lasting only a "couple of weeks," to large acquisition projects lasting 150 to 300 days just to collect the raw seismic data. 2RR.137-38.

Despite the energies expended to collect these sound waves, Montgomery acknowledged that these sound files, or "raw" seismic data, are "really sort of useless until you process them." 2RR.89. Montgomery explained that these sound recordings—which sound only like a "low rumble," a "high whine," an "engine running," or a "big boom" depending upon the tool used to create the sound wave—are rarely listened to, even by CGG employees. 2RR.136. Rather, starting from the earliest stages of

6

the seismic-data-acquisition process, when the vibroseis truck operator is monitoring the acquisition of the seismic data in the field while he is still in the field, the sound data is already transformed into a picture format for visual monitoring. 2RR.135-36.

This raw seismic data, likewise, is of limited value to CGG's oil-and-gas clients. 2RR.142. Montgomery testified that "before the oil and gas company can use it extensively, it has to have processing applied to it." *Id.* CGG Veritas provides these processing services using sophisticated computer programs and proprietary algorithms to process the seismic sound files into visual renderings of the earth's subsurface. CR.265.

CGG Veritas's processing procedure consists of "taking the raw seismic data and transforming that into a three-dimensional image or a seismic image, something that we can use." 2RR.89. Although collecting the seismic data may be time consuming, processing that data takes longer. 2RR.139-140. For small data-acquisition projects, Montgomery estimated that CGG Veritas would take three weeks to a month to process the data into the three-dimensional picture that the client would view. 2RR.138-139. By contrast, for large projects, CGG Veritas could

take up to 18 months to process the project to a final image, although the company would release intermediate images along the way. 2RR.140.

CGG Veritas's complex process of transforming raw sound waves into the end-result images relies on a combination of its "highly specialized algorithms," 2RR.89, and the expertise of its "highly trained and experienced people" who operate CGG Veritas's complex software and hardware systems. 2RR.90. In Houston alone, the processing team consists of 200 geoscientists, most of whom have Ph.D.s in the hard sciences. *Id.* Montgomery explained that "it's really sort of high level work to be able to do this;" the company could not simply "dump it in and turn a crank." *Id.*

Montgomery explained that the processing was "somewhat of an art" because it entails a "subjective" component that could result in CGG Veritas's competitors producing a slightly different image from the same raw data. *Id.* Montgomery explained that the raw seismic data "really doesn't look like anything like a final image" that "the oil and gas company would be looking at." 2RR.92.

CGG Veritas profits from these efforts in two ways. First, "oil and gas producers will hire Veritas to assign crews to perform geophysical

data acquisition services" on a proprietary basis. CR.7. CGG Veritas acquires seismic data and processes that data into an appropriate image for individual proprietary customers, who purchase exclusive rights in the data and image. *See* 2RR.97-98, 117. When CGG performs "proprietary work," it provides the client with both "data acquisition and processing" "the majority of the time." 2RR.109. The contract includes the names and qualifications of the processors, because "the company that's contracting for this wants to make sure that the people that are doing this have enough experience and expertise to be able to carry out the work." 2RR.112-13.

CGG Veritas also has a separate, non-proprietary revenue stream generated by its MCDL. CR.266. From "time to time," CGG Veritas will survey a prospective area, process the raw data, and put the data and resulting images on its MCDL. 2RR.118-19. The seismic data on the MCDL is licensed on a per-product basis to clients who do not have proprietary ownership rights in that data. 3RR.12. CGG Veritas "owns the data," and the MCDL clients get a license to use the data product that the client selects. 2RR.124-25.

Clients license the MCDL items on a per-product basis. 3RR.12. A product may typically be an image of a particular geographic area, such as the "Bessie" location in East Texas. 3CR.16. These data products are licensed "off the shelf," and are not typically created for any particular client. Large projects may be licensed by a number of persons, while small ones may not be licensed as much. 3RR.18. CGG Veritas "intend[s]" or "hope[s]" that each of the nearly 12,000 registered oil and gas companies will purchase or license its products from the MCDL. 2RR.120. Montgomery, however, testified that the largest number of licensees for any MCDL product was 114, to his knowledge. 3RR.17.

On occasion, CGG Veritas will process raw data that it did not collect when a customer brings its own raw data and requests that CGG process it. 2RR.141-42.

CGG Veritas's clients use the data as a guide to where to drill for oil and gas. Montgomery testified that its data could also be used to decide not to drill, at least not in a particular location like an "overpressured" zone that would cause a "big blowout." 2RR.130.

### III. CGG'S 2008 FRANCHISE TAX FILING AND LAWSUIT

For franchise tax Report Year 2008, CGG Veritas claimed a COGS deduction consisting of $567,600,223 in costs that CGG Veritas alleges were incurred in producing its recordings and processed images during 2008. CR.267. In claiming that amount, CGG Veritas did not distinguish between the costs to produce the recordings versus the processed images, nor did it differentiate between the costs it incurred in producing for its MCDL-licensing revenue stream versus its sold-content revenue stream. *Id*. Applying that deduction, CGG originally paid $1,251,645.11 in franchise tax. *Id.*

In 2010, the Comptroller issued a notice disallowing CGG's cost-of-goods-sold deduction in its entirety, and assessed $1,301,568.86 in additional franchise tax due, plus $93,357.68 in interest. *Id*. On April 17, 2012, following the dismissal of an administrative suit, the Comptroller issued an updated notice that increased the interest due to $179,850.42. *Id*. On May 2, 2012, CGG paid $1,483,232.96 to the Comptroller under protest, an amount that constituted the additional franchise-tax assessment with all interest due as of that date. *Id.*

CGG Veritas filed suit the same day, challenging the disallowance of its COGS deduction and seeking a refund of the amount that it paid under protest. *See* CR.9. State Defendants answered, and also asserted a counterclaim that a portion of CGG Veritas's claimed research and development Credit on its 2008 Texas Franchise Return lacked foundation, resulting in an underpayment by CGG Veritas of $991,285.11. CR.26. The parties then agreed to a bifurcated non-jury trial the trial on the claim and the counterclaim. CR.35. The parties later stipulated to the appropriate amount of the credit that was the subject of the counterclaim. CR.250. That credit is not at issue here.

In February 2014, the trial court held a two-day bench trial on CGG Veritas's COGS-deduction claim. CR.250. The trial culminated in a final judgment allowing CGG to deduct its entire $567,600,223 in costs pursuant to the statutory COGS deduction. CR.250. The Court ordered that CGG Veritas's tax due for Report 2008 was $1,721,022.23,[1] and ordered the Comptroller to issue an appropriate check, including statutory interest. CR.250.

---

[1] The judgment also noted that the parties had stipulated that the amount of the research and development carry forward credit available for CGG Veritas to claim with its 2008 Texas Franchise Tax Report is $782,268. R.250.

CGG Veritas then submitted proposed findings of fact and conclusions of law, and State Defendants submitted objections. CR.255-263. The trial court made a number of determinations that it labeled as findings of fact, including:

2. CGG is a fully-integrated geo-sciences company that performs exploratory testing to produce seismic sound recordings and images that CGG sells on both a proprietary basis and licenses on a multi-client basis.

4. CGG processes the seismic sound recordings [that it creates] into visual images of the Earth's subsurface, using sophisticated computer programs and proprietary algorithms.

6. Customers purchase, license, and use CGG's seismic sound recordings and images to determine where to explore and drill for oil and gas.

7. CGG's seismic services and products are an integral, essential, and direct component of the oil and gas drilling process.

8. In performing seismic work, CGG furnishes labor, including the expenditure of employee effort to acquire seismic data and to create seismic surveys and images.

10. CGG creates and furnishes seismic sound recordings and images to customers for use in oil and gas drilling projects.

11. CGG's non-proprietary seismic sound recordings and images are held for licensure to the public through its multi-client data library ("MCDL").

13. At the time that costs are incurred to produce seismic sound recordings and images to be sold through CGG's multi-

client data library, CGG intends or believes it reasonably likely that any medium in which its seismic product will be embodied will be mass-distributed by CGG for licensure to as many customers as possible in a form that is not substantially altered.

14. For Franchise Tax Report Year 2008, CGG originally paid $1,251,645.11, which was calculated using a cost-of-goods-sold deduction of $567,600,223.

CR. 265-67 (citations omitted).

The trial court also issued a number of conclusions of law, including:

1. CGG furnishes labor and materials to projects for the construction, improvement, remodeling, repair, or industrial maintenance of oil and gas wells within the meaning of Tex. Tax Code § 171.1012(i).

2. CGG's seismic sound recordings and images qualify as "tangible personal property" under Tex. Tax Code § 171.1012(a)(3)(A)(ii).

3. Oil and gas wells constitute real property for purposes of Tex. Tax Code § 171.10 12(i).

4. CGG is eligible for the cost-of-goods-sold deduction under the third sentence of Tex. Tax Code § 171.1012(i).

5. CGG's seismic sound recordings and images contained within its multi-client data library constitute "tangible personal property" under Tex. Tax Code § 171.1012(3)(A)(ii).

6. Through its multi-client data library, CGG licenses "goods" in the ordinary course of business within the meaning of Tex. Tax Code § 171.1012(a)(l).

14

7. CGG is eligible for the cost-of-goods-sold deduction under Tex. Tax Code § 171.1012(a)(l), 171.1012(a)(3)(A)(ii), and 171.1012(i).

8. Each of the costs that CGG included in its cost-of-goods-sold deduction were allowed by Tex. Tax Code § 171.1012(c), (d) and (f).

9. CGG is entitled to claim a cost-of-goods-sold deduction in the amount of $567,600,223 for franchise tax Report Year 2008.

CR.268.

The trial court made no conclusions as to whether the relevant statutory provisions were ambiguous, or whether State Defendants' interpretations of those provisions were reasonable. The court did note, however, that "any finding of fact that is more properly characterized as a conclusion of law shall be considered a conclusion of law." CR.267.

After the entry of the findings of fact and conclusions of law, State Defendants perfected this appeal.

## SUMMARY OF ARGUMENT

CGG Veritas is not entitled to take a COGS deduction for the costs that it incurs in providing sophisticated geological imaging services and seismic data to oil and gas companies. The Comptroller correctly interpreted the Tax Code as disallowing CGG Veritas's $567,600,223,

million COGS deduction.[2] The district court's judgment allowing the deduction should be reversed for two reasons.

First, the judgment should be reversed because the COGS statute does not allow CGG Veritas to deduct its costs of doing business. CGG Veritas's services and products are not "tangible personal property," and so do not meet the criteria for deduction under § 171.1012(a)(1) (defining "goods" for purposes of the COGS deduction). Rather, they are "services" and "intangible" property, respectively. The Legislature has explicitly excluded both services and intangible property from the definition of "tangible personal property," and also from COGS-deduction eligibility under § 171.1012(a)(1). TEX. TAX CODE § 171.1012(a)(3)(B)(i)-(ii).

The district court ignored the text of the statute and concluded that CGG was eligible to deduct its costs under subsection (a)(1)—despite CGG Veritas's pleading of the fact that it is hired to provide "services," and despite the district court's own finding that CGG Veritas provides

---

[2] That figure is a total of CGG Veritas's categories of costs (under Texas Tax Code § 171.1012(c), (d), and (e), and (f) respectively) and its subtracted intra-group eliminations. CR.267, FOF 15. Because the costs deducted under subsections (d) and (e), and (f) are dependent upon there being eligible costs under subsection (c), those costs are not eligible for deduction if State Defendants prevail on their argument here that CGG Veritas was not entitled to deduct any costs under subsection (c). This brief shall refer to the approximately $568 million total figure for convenience.

16

such "services." CR. 7, 266. The district court also found that CGG Veritas sells "products," but that product is intangible seismic data. Courts across the state, including the Texas Supreme Court, have declared seismic data to be an "intangible asset," a "trade secret," and "intellectual property." It is intangible in the truest sense.

CGG Veritas, however, creatively attempts to avail itself of the COGS deduction under §171.1012(a)(3)(A)(ii). That provision allows an entity to deduct as "tangible personal property" the costs of producing "sound recordings" or "other similar property" that is intended to be "mass-distributed" in a "form that is not substantially altered"—like a record company's music. *Id.* This argument falls flat.

Although CGG Veritas commences its seismic-data-acquisition process by creating and capturing sound waves, it acknowledges that those big booms and low rumblings are rarely listened to, and are "sort of useless" before they are processed into pictorial seismic data. 2RR.89, 136. It then uses sophisticated computer algorithms and technology to process these sound files into 3D or 4D graphic renderings of the Earth's subsurface that are nothing like the sound files. They are substantially altered.

17

Regardless, neither the sound files themselves nor the images painstakingly derived from those recordings are ever "mass distributed" like a Taylor Swift album, or even like the ill-fated *Playing with Fire* album from Kevin Federline. On the contrary, for Report Year 2008, CGG Veritas produced most of its seismic data for proprietary sales to single clients who then own all rights in the data—the very antithesis of mass distribution. And simply hoping to license its expensive data products to as many clients as possible is not the same as intent to distribute any particular product on a mass scale.

In any event, the judgment allowing the $568 million COGS deduction on this theory must be reversed to the extent that CGG Veritas has failed to distinguish its non-qualifying costs from its qualifying costs, assuming *arguendo* that even some of its costs properly qualified. Although CGG Veritas has distinguished the costs of its proprietary revenue stream and its MDCL stream, it has not distinguished all of its raw-data collection costs from its processed-data costs, or its service costs from its data-product costs. Therefore, if any of these undistinguished costs do not qualify for the COGS deduction, then CGG Veritas has not

carried its burden of proving the exact amount of the tax refund to which it is entitled, and judgment must be rendered for State Defendants.

Second, CGG Veritas's other theory supporting a COGS deduction—that it is "furnishing labor or materials to a project for the construction . . . of real property"—fares no better. TEX. TAX CODE § 171.1012(i). Section 171.1012 explicitly addresses "geological and geophysical" services of the sort that CGG Veritas provides, *id.* § 171.1012(c)(10), but the Legislature does not consider them to be either "labor" or "materials"—the only costs that qualify for deduction under § 171.1012(i). Even if this were otherwise, the services and products that CGG Veritas provides are too far removed from any drilling "project" to qualify under § 171.1012(i). Indeed, the seismic data that CGG Veritas produces may well convince a company *not to* commence a drilling project at all.

Although § 171.1012 enables an oil or gas company to take a COGS deduction for its seismic-data service costs, no statutory provision authorizes a geo-sciences company like CGG Veritas to do the same. Accordingly, the judgment allowing the COGS deduction should be reversed.

19

## STANDARD OF REVIEW

Because the "decisive issues in this case concern the appropriate interpretation of provisions of the franchise-tax statute as applied to the undisputed evidence about [CGG Veritas's business]," the "dominant issue in this case concerns a matter of statutory construction," which is reviewed *de novo*. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006).

When construing a statute, the court's "primary objective is to ascertain and give effect to the Legislature's intent" as discerned by considering the statute "as a whole." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). The court "determine[s] legislative intent from the entire act and not just isolated portions." *Fredericksburg Care Co., L.P. v. Perez*, 13-0573, 2015 WL 1035343, at *4 (Tex. Mar. 6, 2015). The Court "avoid[s] construing a statutory provision in isolation from the rest of the statute," but instead "consider[s] the act as a whole, and not just single phrases, clauses, or sentences." *City of Austin, et al. v. Sw. Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002).

The language emerging from the legislative process "constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, the judge's inquiry is at an end." *Combs v. Roark*

20

*Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (citation and internal quotation marks omitted).

If the statutory language does not unambiguously require a particular outcome, the Court applies dominant rules of statutory construction, including that the Court give "serious consideration" to the construction of a statute by the administrative agency charged with its enforcement. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008); *Combs v. Home & Garden Party, Ltd.*, No. 03-09-00673-CV, 2010 WL 4367054, at *2 (Tex. App.—Austin 2010, no pet.) (mem. op.) (deferring to Comptroller's reasonable interpretation). Comptroller decisions that are interpretations of Comptroller administrative rules are likewise entitled to deference unless the Comptroller's decision is inconsistent with the statute's text. *See Combs v. Chevron*, 319 S.W.3d 836, 841-42 (Tex. App.—Austin 2010, no pet.).

## ARGUMENT

### I. THE DISTRICT COURT MISINTERPRETED EITHER THE LAW OR THE LEGAL STANDARD IN RULING THAT CGG VERITAS'S COSTS QUALIFY FOR THE COGS DEDUCTION.

The district court erred as a matter of law in concluding that CGG Veritas was entitled to claim a COGS deduction in the amount of

approximately $568 million under Texas Tax Code §§171.1012(a)(1), 171.1012(a)(3)(A)(ii), and 171.102(i). CR.268. In reaching that conclusion, the district court did not explain whether it had found those provisions to be unambiguous, or whether it had resolved the ambiguity by adopting CGG Veritas's interpretations of those provisions. *Id.*

Regardless of which path the court chose, the resulting decision was incorrect. As explained below, the statutory COGS-deduction qualifications are unambiguous. CGG Veritas's costs simply do not meet those qualifications. Alternatively, if the statutory provisions were ambiguous, any doubts must be resolved against CGG Veritas because it is claiming a statutory tax exemption.

It is well established that where exemption eligibility is at issue, "all doubts are resolved in favor of the taxing authority and against the claimant," and the claimant must "clearly show that it comes within the statutory exemption." *See, e.g., Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 272 (Tex. 1979); *N. Alamo Water Supply Corp. v. Willacy Cnty. Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991); *GTE Sw. Inc. v. Combs*, 03-08-00561-CV, 2010 WL 2218662, at *2 (Tex. App.—Austin June 3, 2010, pet. denied) (mem. op.) ("The burden of proof for showing

22

the exemption applies lies with the claimant. An exemption must affirmatively appear in the statute, and all doubts are resolved in favor of the taxing authority." (citation omitted)); *Strayhorn v. Raytheon E-Sys., Inc.*, 101 S.W.3d 558, 565, 567 (Tex. App.—Austin 2003, pet. denied) (stating that the claimant "has the burden" of showing with "clear evidence" that it is "entitled to the exemption").

Tax exemptions are "not favored by the law and will not be favorably construed." *N. Alamo*, 804 S.W.2d at 899. Indeed, the Texas Supreme Court has cautioned that

> [s]tatutory exemptions from taxation are subject to strict construction since they are the antithesis of equality and uniformity and because they place a greater burden on other taxpaying businesses and individuals. An exemption cannot be raised by implication, but must affirmatively appear, and all doubts are resolved in favor of taxing authority and against the claimant. Simply stated, the burden of proof is on the claimant to clearly show that it comes within the statutory exemption.

*AHF-Arbors at Huntsville I, LLC v. Walker Cnty. Appraisal Dist.*, 410 S.W.3d 831, 838 n. 30 (Tex. 2012) (quoting *Bullock*, 584 S.W.2d at 271-72 (Tex. 1979)).

This Court has held that it reaches the question whether a statutory provision is a tax exemption only when the statute is found to

23

be ambiguous. *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 56 n.9 (Tex. App.—Austin 2013, no pet.). Should this Court conclude that the provisions here are ambiguous, this Court should reach the question and hold that the COGS deduction is a franchise-tax exemption and not a franchise-tax exclusion. This is so for two reasons.

First, in decisions interpreting the repealed franchise tax, this Court has held that "[t]ax provisions authorizing a deduction are tantamount to an exemption." *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 606 (Tex. App.—Austin 2000, pet. denied). Nothing about the new franchise-tax statute warrants a change in reasoning.

Second, in interpreting the Tax Code, this Court has credited the Comptroller's longstanding position that "an exemption carves out an otherwise taxable item, whereas as an exclusion is an item that is simply not taxed by the code." *Roark Amusement & Vending, L.P. v. Combs*, No. 03-10-00105-CV, 2011 WL 255535, at *4 (Tex. App.—Austin Jan. 26, 2011) (mem. op.) (citation omitted), *aff'd on other grounds*, 422 S.W.3d 632 (Tex. 2013). Section 171.101 (a) provides that the margin of a taxable entity is computed by calculating 70 percent of the taxable entity's total revenue, subtracting cost of goods sold from its total revenue, or

24

subtracting compensation from its total revenue, whichever is less. Thus, the COGS deduction is a franchise tax exemption. It allows a taxpayer to subtract otherwise-taxable revenue.

In short, the provisions of § 171.1012 are unambiguous and compel the conclusion that CGG Veritas's costs are not eligible for the COGS deduction. But if this Court finds that those provisions are susceptible to multiple meanings, then the court must construe any doubts regarding exemption eligibility against CGG Veritas and should defer to the Comptroller's reasonable interpretation.

## II.	CGG VERITAS'S BUSINESS COSTS ARE NOT ELIGIBLE FOR THE COGS DEDUCTION PURSUANT TO TAX CODE § 171.1012(A)(1) .

CGG Veritas's business costs do not qualify for the COGS deduction under § 171.1012(a)(1) and § 171.1012(a)(3)(A)(ii) of the Tax Code. The district court's judgment to the contrary must be reversed for three reasons.

First, this  case of turns on the plain meaning of the definitions of the terms "services" and "intangible property," which have been used by the Legislature to establish two exclusions from the term "goods" as defined in Texas Tax Code § 171.1012(a). Although the term "services" is not defined in the Tax Code, the Texas Supreme Court has recognized

that it "includes generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed." *Kirby Lake Dev., LTD v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010). CGG Veritas pleaded and the district court found that at least some of CGG Veritas's $568 million in costs correspond to its "services," but § 171.1012 explicitly excludes "services" from the definition of "goods" whose costs are eligible for the COGS deduction. TEX. TAX CODE § 171.1012(a)(3)(B)(ii). CGG Veritas is bound by its pleading and cannot deduct the value of these services as though they were "goods."

Second, CGG Veritas's data products constitute "intangible property," but the Legislature has excluded such intangible property from § 171.1012(a)(1)'s definition of "goods." *Id.* § 171.1012(a)(3)(B)(i). Intangible property includes things that are "owned," and such ownership can be asserted over rights that are of value even when the rights do not arise from things that are tangible—such as claims against third persons which may be enforced by action, and, if the law permits, be assigned for a price, are of value and thus entitled to be termed property in the broader sense. Bank accounts, debts generally, corporate

26

stock, patents and copyrights are common instances of this class of property. *See* Ray Andrews Brown, THE LAW OF PERSONAL PROPERTY 11 (3d ed., Walter B. Raushenbush ed. 1975); *see TGS-NOPEC*, 340 S.W.3d at 439.

In the present case, CGG Veritas, as the creator and owner of certain intangible assets consisting of sound files that are convertible into images and the generated images, has sold its intangible property under licenses and thereby conveyed limited rights to its customers that are legally enforceable during the franchise tax period at issue. In *TGS-NOPEC*, the Texas Supreme Court has held that such property is "intangible." *TGS-NOPEC,* 340 S.W.3d at 444. Although a different portion of the Tax Code was there at issue, the Legislature has not excluded seismic data from the meaning of the term "intangible property" in §171.1012. *See id. TGS-NOPEC* controls, so CGG Veritas cannot claim that any of its data products constitute "goods" for purposes of the COGS deduction.

Third, CGG Veritas's business costs do not qualify as "tangible personal property" under § 171.1012(a)(3)(A)(ii), so they are not eligible for deduction under § 171.1012(a)(1). CGG Veritas's services and data

products are not similar to the listed items in that provision, and they do not meet the statutory requirement of being intended for distribution on a large scale to a large number of clients. CGG Veritas's contrary argument is basically simply that its raw and processed seismic data can be seen or heard by its customers. But if this were enough, then any number of service providers and intangible property producers could take COGS deductions for their costs simply by pointing to some final product that can be experienced by its customers' senses. Nothing in the statute suggests that the Legislature intended to make the COGS deduction so expansive. The judgment should be reversed and the Court should find that CGG Veritas is not entitled to a COGS deduction or any corresponding tax refund.

A. **The District Court Found that CGG Veritas Provides "Services," But Erroneously Allowed It to Deduct the Costs of These Services under § 171.1012(a)(1).**

In the Tax Code provision that governs the determination of an entity's COGS deduction, the Legislature defined the "goods" qualifying for deduction to mean "real or tangible personal property sold in the ordinary course of business of a taxable entity." TEX. TAX CODE § 171.1012(a)(1). The Legislature has explicitly determined that

"'tangible personal property' does not include . . . services." *Id.* § 171.1012(a)(3)(B)(ii).

The district court found that CGG Veritas provides both "services and products" to its clients. CR.266, FOF 7. Despite the statute's explicit exclusion of "services" from the definition of "tangible personal property," the district court nevertheless proceeded to conclude that CGG Veritas was "eligible[3] for the [COGS] deduction under § 171.1012(a)(1) and § 171.1012(a)(3)(A)(ii) (defining "tangible personal property"). CR.268, COL 7.

CGG Veritas's own pleadings demonstrate the need to reverse on the ground that at least some of its costs (for which it claimed a COGS deduction under § 171.1012(a)(1)) were incurred in providing "services" as opposed to "tangible personal property." Here, CGG Veritas pleaded that, with respect to its proprietary-sales revenue stream, "oil and gas producers will hire [CGG] Veritas to assign crews to perform geophysical

---

[3] Although the court did not specifically rule that it was including the cost of CGG Veritas's "services" in this eligibility, this Court should find that it did so for two reasons. First, CGG did not distinguish which of its $568 million in costs were incurred in providing "services" as opposed to providing "products." Second, CGG Veritas has argued that its business is generally eligible for a COGS deduction under § 171.1012(a)(1), and has never suggested that it has certain service-related costs that would not qualify.

data acquisition services." CR.7, ¶6. Thus, according to CGG Veritas, the essence of these proprietary-sale contracts are "geophysical data acquisition *services*." *Id*. (emphasis added). This assertion is binding upon CGG Veritas, and prevents it from deducting the costs of these services under § 171.1012(a)(1). *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 769 (Tex. 1983).

Other evidence likewise supports the district court's determination that CGG Veritas provides its clients with "services." CR.266, FOF 7. The company's name is CGG Veritas Services, (U.S.), Inc. Its "Master Agreement for Geophysical Services" describes the "nature of the work" contracted for as "conducting geophysical surveys." Plf's Ex. 7, 4RR.83

CGG Veritas also views its processing work as "services." 2RR.104 (acknowledging that data acquisition is a "service[]" it provides); 2RR.114 (acknowledging that a Master Processing Order is a "contract to –for a processing service"); 5RR35 (data transformation services). Its contracts include the names and qualifications of the individual processors, most of whom have advanced science degrees, 2RR.112-113, thus emphasizing the credentials of the persons providing the services. CGG also describes

its business as including "services" throughout its Securities and Exchange Commission Form 20-F. 5RR.55-227 (Defs' Ex. 14)

The district court therefore erred by allowing CGG Veritas to deduct its costs of providing these "services" under § 171.1012(a)(1). Although CGG Veritas emphasizes the service-nature of its business in order to argue that it provides "labor" under § 171.1012(i), the same business activities cannot simultaneously be "services" for purposes of that subsection and "not services" for purposes of § 171.1012(a)(1). The finding that CGG Veritas offers "services" is fatal to its recovery of costs for those services under § 171.1012(a)(1).[4]

In a suit for a tax refund, a taxpayer must conclusively establish that a tax was overpaid and the exact amount of that overpayment. *Baker v. Bullock*, 529 S.W.2d 279, 281 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.). Because CGG Veritas provided no evidence capable of distinguishing which of its costs related to "services" as opposed to its

---

[4] As explained in Part III, services are deductible under § 171.1012(i) if they are "labor," but CGG Veritas's services are not "labor."

31

"products," CGG Veritas has not met its burden of proving the exact amount of tax refund to which it is entitled.[5]

**B.** **The District Court Erred By Failing to Interpret the Statutory Term "Intangible Property" to Include CGG Veritas's Data Products.**

Like "services," the Legislature has likewise explicitly excluded "intangible property" from the definition of "tangible personal property." TEX. TAX CODE § 171.1012(a)(3)(B)(ii). Here, the statutory term "intangible property" includes CGG's gathering, interpreting, licensing, and selling of seismic and geophysical data. *Id.* § 171.1012(a)(1).

To the extent that CGG Veritas sells a "product" as opposed to a "service," that product is geophysical or seismic "data." *See, e.g.,* 2RR.76, 4RR.321-23 (Plf's Ex. 22); 5RR.20, 28-30 (Defs' Ex. 4). *See TGS-NOPEC*, 340 S.W.3d at 435 ("This appeal arises from a franchise tax dispute involving the apportionment of receipts from the licensing of geophysical and seismic data to customers in Texas"); *Geomap Co. v. Bullock*, 691 S.W.2d 98, 99 (Tex. App.—Austin 1985, writ ref'd n.r.e) ("Geomap is a

---

[5] CGG Veritas's chart at Plaintiffs' Exhibit 49, 4RR.710, does not distinguish between which costs relate to "services" as opposed to "products." Alternatively, if this Court concludes that the chart adequately distinguishes them, remand is appropriate so that the district court can determine the amount of refund owed, if any.

Texas corporation engaged in the business of selling its interpretations of geological data to the oil and gas industry."); *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 300 (Tex. App.— Houston [14 Dist.] 2010, pet. denied) ("TGS records and processes geophysical seismic data, primarily offshore, and sells the data to oil and gas companies."). This is true of both of its "raw" data, which encompasses the unprocessed sound files that are obtained by recording the sound waves from the manipulations of the earth, and also the resulting processed data consisting of the visual images that interpret the raw seismic data. *In re Bass*, 113 S.W.3d 735, 741 (Tex. 2003) (referring to the "data obtained from the seismic shoot," "data and data-interpretations," and the "3-D geological seismic data" as "data.").

The Texas Supreme Court has already held that such data constitutes "intellectual property," and that receipts from such licensed data are from the "sale of an intangible asset" for purposes of the franchise tax. *TGS-NOPEC Geophysical*, 340 S.W.3d at 442. This holding controls here. At the very least, it compels the conclusion that the Comptroller's interpretation of "intangible property" as including CGG

Veritas's data is a reasonable one, and any doubt must be resolved against CGG Veritas.

In *TGS-NOPEC*, the Texas Supreme Court considered how to characterize the revenue that the company received from its business activities, which consisted of (1) gathering, interpreting, and marketing "seismic and geophysical data regarding subsurface terrains worldwide with sophisticated seismic equipment and software technology," and (2) then licensing that data through its master library to customers who use the licensed data to evaluate that data to evaluate oil and gas formations." *Id.* at 435. Although the case did not involve § 171.1012, the issue was whether the receipts from these licensures "should be categorized as receipts from the use of a license or as receipts from the sale of an intangible asset." *Id.*

The Texas Supreme Court there agreed with the company's position that its receipts were from the use of "an intangible asset"—"geophysical data." *Id.* at 441, 443-44. The Court reasoned that "revenue TGS receives from conveying its geophysical data is not derived from the use of a license but from the use of the underlying intellectual property, the data." *Id.* at 442. The Court also noted that the master license agreement

described TGS's data as "proprietary information and as valuable and highly confidential trade secrets." *Id.* at 435; *see also In re Bass*, 113 S.W.3d at 740 (noting industry wide practice of "treating seismic data as trade secrets").

Given the Supreme Court's description of this seismic data as an "intangible asset," "intellectual property" and a "trade secret," the statutory term "intangible property" must be interpreted to include CGG Veritas's seismic data. At the very least, these findings raise enough doubt to require the exemption to be construed against CGG Veritas. CGG Veritas's response is that the Legislature carved out seismic data in §171.1012(a)(3)(A)(ii) from the definition of "intangible property." That interpretation, however, is untenable because its products are neither similar to the statute's listed forms of tangible property nor intended for distribution on a large scale. *See infra* Part II.C. CGG Veritas's intangible-property costs therefore are not "tangible personal property" for purposes of that provision.

### C. CGG Veritas's Data and Services are not "Tangible Property" Under §171.1012(a)(3)(A)(ii).

The district court misinterpreted § 171.1012(a)(3)(A)(ii) in concluding that CGG Veritas's products are "tangible personal property"

that meet the COGS-deduction criteria in § 171.1012(a)(1). CR.266-68,

FOF 12, 13, COL 2, 5. That provision defines "tangible personal property"

to include

> films, sound recordings, videotapes, live and prerecorded television and radio programs, books, *and other similar property* embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, *it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator* or any one or more third parties in a form that is not substantially altered.

TEX. TAX CODE §171.1012(a)(3)(A)(ii) (emphasis added).

The statute does not support CGG Veritas's efforts to deduct its

costs under this provision for three reasons. First, as to all of CGG

Veritas's costs for which its 2008 COGS deduction was claimed, it is not

"intended or is reasonably likely" that the corresponding data products

would "be mass-distributed by the creator." *Id.* Here, it is undisputed

that CGG Veritas never mass-distributes any of the data that it sells

through its proprietary-sale revenue line—the costs of which are included

in its $568 million. 2RR.45-46, 48. CGG Veritas has even pleaded as

much. CR.7 ("[a]ny data acquired belongs exclusively to the customers

36

who hired the crews"). Proprietary sales are the very opposite of mass distribution.

This reason is enough to reverse the district court's judgment. CGG Veritas acknowledges that if its proprietary-sales revenue lines do not qualify for the COGS deduction, and it must rely on its MCDL line alone, then CGG Veritas is not entitled to a tax refund at all. *See* Plfs' Ex. 49, 4.RR.710.

Its MCDL costs fare no better in terms of mass distribution The district court misinterpreted the statute's intended-mass-distribution requirement as requiring only that CGG Veritas "intend[] or believe[]" that its seismic product "will be mass-distributed by CGG for licensure to as many customers as possible." CR.267, FOF 13. This does not follow. "Mass" means "participated in by or affecting a large number of individuals," or "having a large-scale character." MERRIAM-WEBSTER ONLINE, http://www.merriam-webster.com/dictionary/mass (last visited April 14, 2015). Neither of the trial court's findings on this point—that "multiple" customers have licensed the same product from the MCDL, and that CGG Veritas intends for its products to be licensed to "as many

37

customers as possible"—is relevant to whether it intends for any product to reach a large number of businesses or persons. CR.267, FOF 12, 13.

Even if this were a fact issue, there is no evidence to support a finding of intended or actual mass-distribution in the relevant time frame. CGG Veritas's MCDL clients license its products on a per-item basis, but there is no evidence that CGG Veritas distributed even a single product corresponding to its 2008 franchise-tax report to a large number of persons or businesses.

Moreover, Montgomery testified that the largest number of clients to license a single product (out of these thousands of companies) was 114, to his knowledge. 3RR.17. There is no evidence that this particular product corresponds to CGG Veritas's 2008 Texas franchise-tax report. This is unsurprising, given that CGG Veritas's data value lies in its relative exclusivity. CGG Veritas tightly restricts its licensed data clients from sharing CGG Veritas's data with other entities. 2RR.125. One would not expect data that the industry regards as a "trade secret" to be mass distributed. *In re Bass*, 113 S.W.3d at 740

Second, CGG Veritas's business costs do not fall within the definition of "tangible personal property" because its seismic data is not

38

"similar" to the comparison items listed in that statute: films, sound recordings, videotapes, television and radio programs, and books. TEX. TAX CODE § 171.1012(a)(3)(A)(ii). These items are distributed to large numbers of persons in a variety of forms, whether over cable subscription, on DVD, on Blu-Ray, off the shelf, or on a Kindle. The statute also describes "similar property" as embodying "words, ideas, concepts, images, or sound."

Courts must apply the traditional canon of construction *noscitur a solis*—or "it is known by its associates"—to construe terms within a series of terms. *State v. $1,760.00 in US Currency*, 406 S.W.3d 177, 180- 81 (Tex. 2013) (per curiam). Courts will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute. *In re Hall*, 286 S.W.3d 925, 929 (Tex. 2009). "[I]f a different, more limited, or precise definition is apparent from the term's use in the context of the statute," the court applies that meaning. *Id*. Also, the principle of *ejusdem generis* warns against expansive interpretations of broad language that immediately follows narrow and specific terms, and counsels courts to construe the broad in light of the narrow. *Marks v. St. Luke's Episcopal Hospital*, 319 S.W.3d 658, 663 (Tex. 2010).

CGG Veritas's data is nothing like the items listed in §171.1012(a)(3)(A)(ii). Whereas "sound recordings" are typically purchased for their musical or narrative content, CGG Veritas's raw-data sound files are "sort of useless" and are not typically listened to even by its own employees.[6] 2RR.89, 136. Rather, CGG Veritas transforms these files into visual data at the very earliest stage, even while the raw data is still being collected in the field. 2RR.89, 135. Nor are its processed-data images "similar" to the listed items. Montgomery likened its processed data to a "roadmap." 2RR.75. A roadmap does not share the listed items' esthetic, narrative, musical, or artistic value. Even if there were room for doubt, the doubt must be resolved against exemption eligibility.

Third, even if CGG Veritas's raw-data sound files are "similar" to the listed items, that raw data is "substantially altered" by the time a client purchases or licenses the processed data in a 3D or 4D image. CGG

---

[6] CGG Veritas distinguished between "data acquisition" and "data processing" for its proprietary sale line, but did not do so for its MCDL line. It is not clear that "data acquisition" refers to raw-data acquisition only, as opposed to raw and processed data acquisition. Even if the reference is to raw-data acquisition only, and assuming that the costs of that raw-data would qualify for the COGS deduction, then CGG Veritas still is not entitled to a tax refund. Plf's Ex. 49, 4RR. (scenario 1).

Veritas's own documents referred to its processing of raw data as "data transformation." 5RR.35 (Def. Ex. 11). Montgomery testified at length to the complexity of this transformational process, which is completed by scientists with advanced degrees: booms and rumbles become 3D and 4D images that will help an oil company know whether to expend huge sums to drill a well on a particular area. Regardless, CGG Veritas has not sufficiently distinguished the costs of producing its raw data from its costs of its processed data,[7] and so it cannot prove the exact amount of any refund due based on its raw data alone.

So long as the Comptroller's interpretation of the Legislature's "tangible personal property" term is reasonable, doubts must be resolved against CGG Veritas. CGG Veritas's costs simply do not qualify for the COGS deduction under § 171.1012(a)(1) or §171.1012(a)(3)(A)(ii).

III.  **CGG DOES NOT FURNISH LABOR OR MATERIALS TO A PROJECT FOR CONSTRUCTION OF REAL PROPERTY, SO ITS COSTS DO NOT QUALIFY FOR THE COGS DEDUCTION UNDER § 171.1012(I).**

This Court should also reverse the district court's erroneous conclusion that CGG Veritas's business costs for report year 2008

---

[7] Alternatively, if CGG Veritas's use of the term "[data acquisition]" refers only to raw data, then it does not qualify for any refund if only its data acquisition costs qualify for the COGS deduction. Plf's Ex. 49, 4RR.

qualified for the COGS deduction under § 171.1012(i) of the Tax Code. CR.266, 268, FOF 7, COL 1, 4, 7. Specifically, the Court misinterpreted the law in concluding that CGG Veritas "furnishes labor and materials to projects for the construction [or] improvement . . . of oil and gas wells within the meaning of Tex. Tax Code § 171.1012(i)." CR.268, COL 1.

Here, CGG Veritas's business costs are ineligible for deduction under this provision. As explained below, the text of § 171.1012 reveals that the Legislature considers seismic-data services to be neither "labor" nor "materials," as those terms are used throughout that section. Also, even if those services did constitute labor or materials, they are too far removed from any real-property "project" to qualify for the COGS deduction under § 171.1012(i).

This Court's analysis begins by reading § 171.1012 as a whole. "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute," then the court must apply that narrower meaning . *TGS-NOPEC Geophysical,* 340 S.W.3d at 439 (citing *In re Hall*, 286 S.W.3d at 928–29.

Two subsections of § 171.1012 govern whether CGG Veritas's seismic-data services were incurred in "furnishing labor or materials to a project for the construction . . . of real property" in 2008. The first is § 171.1012(i), which states in relevant part that:

> A taxable entity may make a subtraction under this section in relation to the cost of goods sold only if that entity owns the goods. . . . A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance. . . of real property is considered to be an *owner of that labor or materials* and may include the costs, as allowed by this section, in the computation of cost of goods sold.

TEX. TAX CODE § 171.1012(i) (emphasis added).

The second is subsection § 171.1012 (c), which provides:

(c) The cost of goods sold includes all direct costs of acquiring or producing the goods, including:

> (1) labor costs;
>
> (2) cost of materials that are an integral part of specific property produced;
>
> (3) cost of materials that are consumed in the ordinary course of performing production activities;
>
> . . . .
>
> (7) the cost of renting or leasing equipment, facilities, or real property directly used for the production of the goods, including pollution control equipment and intangible drilling and dry hole costs;

43

> > . . . .

> > (10) geological and geophysical costs incurred to identify and locate property that has the potential to produce minerals.

*Id.* § 171.1012(c).

The statutory framework reveals that these provisions work together as follows: Section 171.1012(c) contains an expansive list of cost categories—thirteen in all—that the actual owner of qualifying goods may deduct as a cost-of-goods-sold. *Id.* § 171.1012(c)(1)-(13). Section 171.1012(i)'s deemed-ownership provision, by contrast, is not nearly so broad. It applies only to an entity who "furnish[es] labor or materials" to the construction or improvement of real property, and that provision only allows that furnisher to deduct the costs of the "labor and materials" that it furnished. *Id.* § 171.1012(i); *see id.* § 171.1012(c)(1) (listing "labor costs" as a qualifying COGS deduction); § 171.1012(c)(2), (c)(3) (listing "materials" costs as qualifying COGS deduction).

The effect of this distinction is that an actual owner may deduct a much broader category of costs than an entity relying on § 171.1012(i)'s "labor or materials" deemed-ownership provision. Thus, an oil company— whose production of oil into gasoline at a refinery would qualify the

44

company for a COGS deduction—may deduct all thirteen categories of costs in § 171.1012(c). But an entity relying on deemed ownership as a furnisher of labor or materials is restricted to deducting only the costs of its labor or materials.

The district court's agreement with this interpretation is evidenced by its proper rejection of CGG Veritas's argument that it was entitled to a COGS deduction under § 171.1012(c)(10). CGG Veritas did not fully explain its theory, but its argument suggests that it misinterpreted the statute to make "geological and geophysical costs incurred to identify and locate property that has the potential to produce minerals" deductible by any entity that incurs those costs. This is not so. The statute provides that only the owner of "goods" as defined in §171.1012(a) may deduct the costs listed in § 171.1012(c). As explained in Part I, CGG Veritas's services and intangible property are not "goods." Unless it meets the criteria to be a deemed owner of its clients' goods under §171.1012(i)— and it cannot—then it has no path to a COGS deduction.

A. CGG Veritas Does Not Furnish "Labor" or "Materials."

CGG Veritas does not meet the statutory criteria to be a deemed owner of its clients' goods under §171.1012(i)'s provision for furnishers of

45

labor and materials to a project for the construction, improvement, or modification of real property. CGG Veritas is ineligible because the Legislature does not consider its seismic-data services—which are the "geological and geophysical costs" of locating producing property, *id.* § 171.1012(c)(10)[8]—to constitute either "labor" or "materials" for the purposes of § 171.1012.

Subsection (c) lists "geological and geophysical costs" of locating producing property as a *separate cost* from either "labor costs," "costs of materials that are an integral part of specific property produced"; or "costs of materials that are consumed in the ordinary course of performing production activities." TEX. TAX CODE § 171.1012(c)(10), (c)(1), (c)(2), (c)(3).

CGG Veritas's business activities fall into the category of "geological and geophysical costs" of locating producing property. The Legislature's decision to put "geological and geophysical costs" in an entirely separate category from either labor or materials reveals that it does not consider geological and geophysical costs to be either "labor" or

---

[8] CGG Veritas has argued that its services constitute the "geological and geophysical costs" of locating potentially producing property under § 171.1012(c)(10). CR.8, 3RR.89-91.

46

"materials." Although this Court rejected a similar argument in *Newpark Resources*, 422 S.W.3d 56, that case is distinguishable. The Court there concluded that the transport and disposal of used drilling mud and other waste material was "labor" because such activities fell within the term's common definition "the expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory." *Newpark Res.*, 422 S.W.3d at 56 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1259, 2075 (Phillip Gove Ed. 2002)). Here, CGG Veritas's work is described as "sophisticated"—not fatiguing, difficult, or compulsory. 2RR.48. And while mud transporters must rely heavily on human effort, CGG Veritas's services rely heavily on a "sophisticated processing center that has thousands of CPUs in it that are . . . applying proprietary, patented, copyrighted algorithms." *Id.* The definition simply does not fit.

Nor do CGG Veritas's projects constitute materials that are a part of or consumed in the drilling process. CGG Veritas's images provide a roadmap, and a road map is neither part of the real property nor consumed by it. 2.RR75.

The statutory rules of construction fully support this interpretation of the statute. This Court must presume that in enacting the statute, the

Legislature intended the entire statute to be effective. *See* TEX. GOV'T CODE § 311.021(2). Thus, the Court must give effect to all words of a statute and avoid treating any statutory language as "mere surplusage." *Hawkins v. Dallas Cnty. Hosp. Dist.*, 150 S.W.3d 535, 540 (Tex. App.—Austin 2004, no pet.). Interpreting "geological and geophysical costs" of locating producing property to be "labor" and "materials" costs would render § 171.1012(c)(10) mere surplusage, since labor and materials are already covered by § 171.1012(c)(1), (c)(2), and (c)(3).

This distinction also prevents the terms "labor" and "materials" from swallowing the remaining ten categories of costs—a result not intended by the Legislature. Rather, the text reveals that while the Legislature intended to allow an oil company to deduct its "geological and geophysical costs" of locating producing property as a cost-of-goods-sold, the Legislature did not intend for a geo-sciences company like CGG Veritas to do the same because a geo-science company is not acquiring or producing goods—it is creating intangible property.[9] Subsection (c) of section 171.1012 is limited to taxable entities that acquire or produce

---

[9] At the very least, it creates doubt as to whether the Court considered "geological and geophysical costs" to qualify for the COGS deduction through deemed ownership, and that doubt must be resolved in favor of finding no exemption.

"goods," and goods do not include services or intangible property. See Tex. Tax Code §§ 171.1012(a)(3)(B), 171.1012(c). Otherwise, the Legislature could have drafted § 171.1012(i) to allow an entity to become a deemed owner of and deduct the costs of all of the items in § 171.1012(c)'s thirteen categories simply by virtue of participating in real-property construction. Instead, the Legislature limited both deemed-ownership and the corresponding COGS deduction to only "labor" and "materials."[10]

There is no merit to any argument that CGG Veritas's "geological and geophysical costs" could be "labor" or "materials" for purposes of § 171.1012(i), but not for purposes of § 171.1012(c). This Court has recognized that "[t]he presumption that a term used in different parts of a statute has the same meaning is even stronger where the term is used repeatedly in the same section." *Duvall v. Texas Dept. of Human Servs.*, 82 S.W.3d 474, 480 (Tex. App.—Austin 2002, no pet.).

---

[10] There is no doubt in this case that CGG Veritas performs extremely sophisticated and important work. However, it does not matter whether CGG Veritas's geological and geophysical services and products are "an integral, essential, and direct component" of the oil and gas drilling process, CR.266, FOF 7, if they are not first and foremost "labor" or "materials" for purposes of § 171.1012(i).

49

**B.  CGG Veritas's Services Are Too Far Removed from a "Project" for the Construction of Real Property to Qualify for the COGS Deduction under § 171.1012(i).**

Alternatively, assuming *arguendo* that CGG Veritas's seismic-data services are "labor" or "materials" for the purposes of § 171.1012(i), the judgment must be reversed for a different reason: CGG Veritas's services are "too far removed from the construction, improvement, remodeling, repair, or industrial maintenance of real property to qualify for the [COGS] deduction under section 171.1012(i)." *Newpark Res.,* 422 S.W.3d at 57.

Subsection 171.1012(i) creates a deemed ownership right only for an entity "furnishing labor or materials to a project" for the "construction . . . of real property." Unlike § 171.1012(c)(10), which might allow an oil company to recover its costs of seismic-data services incurred to locate "potential[ly]" producing property regardless of whether a well is ever drilled, § 171.1012(i) can be reasonably interpreted as tethering deemed ownership of "labor" or "materials" to an actual "project," not a potential project.

This poses another problem for CGG Veritas. Montgomery testified that an oil or gas company employs CGG Veritas's seismic-data services

to determine *whether* to commence a drilling project at the location that CGG Veritas surveys. The seismic data that CGG Veritas provides could convince the client not to commence a drilling project, because the endeavor would not be profitable. 2RR.130; 3RR.17 (Montgomery testifying that "there are times when we do a survey and I don't hear of anything being found").

Even if a drilling project does commence, CGG Veritas produced no evidence that it could possibly know whether its services will ultimately benefit an actual drilling project at the time that its costs are incurred, let alone whether those services will be of assistance in the same tax year as when the costs were incurred. When CGG Veritas files its franchise tax report each year, CGG Veritas would not know which of the costs incurred during the year were for data, information, and interpretations that will be used to commence a drilling project in that tax year or a later year. Thus, CGG Veritas's services thus are wholly unlike those of a contractor who moves drilling mud toward or away from an existing project site. *Newpark Res.,* 422 S.W.3d at 56.

This Court has already recognized that there is a point at which the provision of labor or materials is "too far removed from the construction

51

. . . of real property to qualify for the [COGS] deduction under section 171.1012(i)." *Id.* at 57. This Court should hold that this point has been reached here: there is no drilling "project," and may never be a drilling "project" at the point that CGG Veritas incurs its costs in providing seismic data products and services. CGG Veritas's business costs therefore do not qualify for the COGS deduction pursuant to § 171.1012(i) of the Tax Code.

## PRAYER

For these reasons, State Defendants respectfully request that the district court reverse the final judgment finding that COGS was entitled to deduct approximately $568 million in costs and ordering the Comptroller to issue a refund check. State Defendants also request that the court render a take-nothing judgment in their favor. Alternatively, if CGG Veritas has proven that it is entitled to a COGS deduction in a lesser amount, State Defendants request that the Court remand to the district court to calculate any refund owed.

Respectfully submitted.

Dated: April 20, 2015

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

SCOTT A. KELLER
Solicitor General

 /s/ April L. Farris_____
APRIL L. FARRIS
Assistant Solicitor General
State Bar No. 24069702

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-2923
Fax: (512) 474-2697
april.farris@texasattorneygeneral.gov

COUNSEL FOR APPELLANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2015, a true and correct copy of the foregoing document was served via File & ServeXpress to all counsel of record.

Amanda Taylor
James F. Martens
State Bar No. 13050720
Lacy Leonard
State Bar No. 24040561
MARTENS TODD LEONARD & TAYLOR
301 Congress Ave., Suite 1950
Austin, Texas 78701
Tel.: (512) 542-9898
Fax: (512) 542-9899
jmartens@textaxlaw.com
lleonard@textaxlaw.com

/s/ April L. Farris
APRIL L. FARRIS

**CERTIFICATE OF COMPLIANCE**

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief contains 10,333 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

/s/ April L. Farris
APRIL L. FARRIS
Assistant Solicitor General

# APPENDIX

## Appendix Table of Contents

Final Judgment, *CGG Veritas Services v. Susan Combs*,
Cause No. D-1-GN-12-001316 (353rd D. Ct. Travis Cnty.
Sept. 17, 2014) ........................................................................A

Findings of Fact and Conclusions of Law, *CGG Veritas
Services v. Susan Combs*, Cause No. D-1-GN-12-001316
(353rd D. Ct. Travis Cnty. Oct. 13, 2014) ..............................B

TEX. GOV'T CODE § 311.021(2).........................................................C

TEX. GOV'T CODE §§ 403.203 *et. seq.* ..............................................D

TEX. TAX CODE §§ 112.051 *et. seq*....................................................E

TEX. TAX CODE § 171.101(a)(1)(B)(ii)(a)(1) ......................................F

TEX. TAX CODE § 171.1012 ................................................................G

A

Notice sent: Final   Interlocutory   None

Disp Parties:_____ All

Disp code: CVD / CLS 4-UIS

Redact pgs:_____

Judge_ TS _ Clerk_ KAH

Filed In The District Court
of Travis County, Texas

SEP 17 2014

At_____ 5:00 P M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-12-001316

| | | |
|---|---|---|
| CGGVERITAS SERVICES (U.S.) INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SUSAN COMBS, COMPTROLLER OF PUBLIC | § | TRAVIS COUNTY, TEXAS |
| ACCOUNTS OF THE STATE OF TEXAS; | § | |
| AND GREG ABBOTT, ATTORNEY | § | |
| GENERAL OF THE STATE OF TEXAS, | § | |
| | § | |
| Defendants. | § | 353rd JUDICIAL DISTRICT |

## FINAL JUDGMENT

On February 18 and 19, 2014, the Court conducted phase one of a bifurcated bench trial of the above-entitled matter. The issue in phase one of the trial was the proper amount of Plaintiff's cost-of-goods-sold deduction in Report Year 2008. After considering the pleadings, briefings, authorities, statutes, evidence, and argument presented by the parties, the Court rules that the Plaintiff is entitled to claim a cost-of-goods-sold deduction in the amount of $567,600,223.

The issue in phase two of the bifurcated trial is the proper amount of Plaintiff's research and development credit in Report Year 2008. The parties have stipulated that the amount of the research and development carry forward credit available for Plaintiff to claim beginning with its 2008 Texas Franchise Tax Report is $782,268.

The Court orders that Plaintiff's tax due for Report Year 2008 was $1,721,022.23. The Comptroller is ordered to issue an appropriate check, including appropriate statutory interest under TEX. TAX CODE §112.060. This judgment shall not bar CGG from recovering additional

250

franchise taxes arising from a final disposition of its apportionment claims presently pending at the administrative level.

The parties will bear their own attorney's fees and costs of court.

This is a final, appealable order. All relief not expressly granted is denied.

SIGNED this _17TH_ day of September, 2014.

 

THE HONORABLE TIM SULAK,
Judge Presiding
353rd District court
Travis County, Texas

APPROVED AS TO FORM:

/s/ _James F. Martens_
**James F. Martens**
jmartens@textaxlaw.com
Texas Bar No. 13050720
**Lacy L. Leonard**
lleonard@textaxlaw.com
Texas Bar No. 24040561
**Danielle V. Ahlrich**
dahlrich@textaxlaw.com
Texas Bar No. 24059215
Martens, Todd, Leonard & Taylor
301 Congress Ave., Ste. 1950
Austin, TX 78701
(512) 542-9898 – Telephone
(512) 542-9899 – Fax

Attorneys for the Plaintiff

**Charles K. Eldred**
Charles.Eldred@texasattorneygeneral.gov
Texas Bar No. 00793681
**Erika R. Sams**
Erika.Sams@texasattorneygeneral.gov
Texas Bar No. 24083784
Assistant Attorney General
Financial and Tax Litigation Division
P.O. Box 12548
Austin, TX 78711-2548
(512) 463-8897 – Telephone
(512) 457-4423 – Fax

Attorneys for the Defendants

_CGGVeritas Services (U.S.) Inc. v. Combs, et al._
Final Judgment
Page 2 of 2

B

CAUSE NO. D-1-GN-12-001316

| | | |
|---|---|---|
| CGGVERITAS SERVICES (U.S.) INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SUSAN COMBS, | § | TRAVIS COUNTY, TEXAS |
| COMPTROLLER OF PUBLIC | § | |
| ACCOUNTS OF THE STATE OF TEXAS; | § | |
| AND GREG ABBOTT, ATTORNEY | § | |
| GENERAL OF THE STATE OF TEXAS, | § | |
| | § | |
| Defendants. | § | 353rd JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the pleadings, briefings, authorities, statutes, evidence, and argument presented by the parties, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. CGGVeritas Services (U.S.) Inc. ("CGG") satisfied all procedural prerequisites to file a protest suit under Texas Tax Code Chapter 112.

2. CGG is a fully-integrated geo-sciences company that performs exploratory testing to produce seismic sound recordings and images that CGG sells on both a proprietary basis and licenses on a multi-client basis.

   - *See, e.g., Plaintiff's Ex. 7, 9, 10, 14, 17; Testimony of Bob Montgomery*

3. CGG uses tools and devices that impact the Earth's surface and sub-surface to cause disturbances, the effect of which CGG captures as seismic sound recordings.

   - *See, e.g., Plaintiff's Ex. 22, 47; Defendant's Ex. 3-12, 15; Testimony of Bob Montgomery*

4. CGG processes the seismic sound recordings into visual images of the Earth's subsurface, using sophisticated computer programs and proprietary algorithms.

   - *See, e.g., Plaintiff's Ex. 22, 47; Defendant's Ex. 3-12, 15; Testimony of Bob Montgomery*

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 1 of 6

265

5. CGG's customers are generally oil and gas exploration and production companies.

- *See, e.g., Testimony of Bob Montgomery*

6. Customers purchase, license, and use CGG's seismic sound recordings and images to determine where to explore and drill for oil and gas.

- *See, e.g., Plaintiff's Ex. 7, 14; Testimony of Bob Montgomery*

7. CGG's seismic services and products are an integral, essential, and direct component of the oil and gas drilling process.

- *See, e.g., Plaintiff's Ex. 7, 14; Testimony of Bob Montgomery*

8. In performing seismic work, CGG furnishes labor, including the expenditure of employee effort to acquire seismic data and to create seismic surveys and images.

- *See, e.g., Plaintiff's Ex. 7; Testimony of Bob Montgomery*

9. As a necessary part of the seismic labor furnished by CGG, CGG furnishes materials, such as dynamite, geophones, airguns, marine vessels, and vibroseis trucks.

- *See, e.g., Plaintiff's Ex. 7, 9; Testimony of Bob Montgomery*

10. CGG creates and furnishes seismic sound recordings and images to customers for use in oil and gas drilling projects.

- *See, e.g., Plaintiff's Ex. 7, 14; Testimony of Bob Montgomery*

11. CGG's non-proprietary seismic sound recordings and images are held for licensure to the public through its multi-client data library ("MCDL").

- *See, e.g., Plaintiff's Ex. 10, 17, 18; Testimony of Bob Montgomery*

12. Multiple CGG customers have licensed the same product from CGG's multi-client data library.

- *See, e.g., Testimony of Bob Montgomery*

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 2 of 6

266

13.    At the time that costs are incurred to produce seismic sound recordings and images to be sold through CGG's multi-client data library, CGG intends or believes it reasonably likely that any medium in which its seismic product will be embodied will be mass-distributed by CGG for licensure to as many customers as possible in a form that is not substantially altered.

- *See, e.g., Plaintiff's Ex. 25; Testimony of Bob Montgomery*

14.    For Franchise Tax Report Year 2008, CGG originally paid $1,251,645.11, which was calculated using a cost-of-goods-sold deduction of $567,600,223.

- *See, e.g., Plaintiff's Ex. 1; Testimony of Listya Diyah*

15.    CGG's $567,600,223 cost-of-goods sold deduction, was comprised of:
   a.    $674,062,370 of costs under Tex. Tax Code § 171.1012(c); plus
   b.    $17,281,917 of costs under Tex. Tax Code § 171.1012(d); and
   c.    $1,195,014 of costs under Tex. Tax Code § 171.1012(e); less
   d.    $124,939,078 for intra-group eliminations.

- *See, e.g., Plaintiff's Ex. 19, 48; Testimony of Listya Diyah*

16.    On September 24, 2010, the Comptroller issued a Notice that entirely disallowed CGG's cost-of-goods-sold deduction and assessed $1,301,568.86 in additional franchise tax due, plus $93,357.68 in interest.

- *See, e.g., Plaintiff's Ex. 5; Testimony of Listya Diyah*

17.    On April 17, 2012, after dismissal of an administrative suit prior to hearing, the Comptroller issued an updated Notice that assessed the same amount of additional franchise tax due, but increased the interest due to $179,850.42.

- *See, e.g., Plaintiff's Original Petition; Testimony of Listya Diyah*

18.    On May 2, 2012, CGG timely paid the additional franchise tax assessment with all interest due as of that date (totaling $1,483,232.96) under protest in compliance with the statute, and then filed this suit seeking a refund.

- *See, e.g., Plaintiff's Original Petition Ex. 6; Testimony of Listya Diyah*

19.    Any finding of fact that is more properly characterized as a conclusion of law shall be considered a conclusion of law.

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 3 of 6

267

## Conclusions of Law

1. CGG furnishes labor and materials to projects for the construction, improvement, remodeling, repair, or industrial maintenance of oil and gas wells within the meaning of Tex. Tax Code § 171.1012(i)

2. CGG's seismic sound recordings and images qualify as "tangible personal property" under Tex. Tax Code § 171.1012(a)(3)(A)(ii).

3. Oil and gas wells constitute real property for purposes of Tex. Tax Code § 171.1012(i).

4. CGG is eligible for the cost-of-goods-sold deduction under the third sentence of Tex. Tax Code § 171.1012(i).

5. CGG's seismic sound recordings and images contained within its multi-client data library constitute "tangible personal property" under Tex. Tax Code § 171.1012(3)(A)(ii).

6. Through its multi-client data library, CGG licenses "goods" in the ordinary course of business within the meaning of Tex. Tax Code § 171.1012(a)(1).

7. CGG is eligible for the cost-of-goods-sold deduction under Tex. Tax Code § 171.1012(a)(1), 171.1012(a)(3)(A)(ii), and 171.1012(i).

8. Each of the costs that CGG included in its cost-of-goods-sold deduction were allowed by Tex. Tax Code § 171.1012(c), (d) and (f).

9. CGG is entitled to claim a cost-of-goods-sold deduction in the amount of $567,600,223 for franchise tax Report Year 2008.

10. The parties stipulated that the amount of the research and development ("R&D") carry-forward credit available for CGG to claim beginning with its 2008 Texas Franchise Tax Report is $782,268.

11. Using the above-stated cost-of-goods-sold deduction and applying the above-stated R&D credit to CGG's franchise tax calculation for Report Year 2008 based on its originally-used apportionment factor of 0.5166, CGG's franchise tax due for Report Year 2008 is $1,721,022.23.

12. The Court's judgment shall not bar CGG from recovering additional franchise taxes arising from a final disposition of its apportionment claims presently pending at the administrative level.

13. Any conclusion of law that is more properly characterized as a finding of fact shall be considered a finding of fact.

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 4 of 6

268

SIGNED this _____13TH_____ day of October, 2014.

THE HONORABLE TIM SULAK,
Judge Presiding
353rd District court
Travis County, Texas

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 5 of 6

269

/s/ Amanda G. Taylor

**James F. Martens**
jmartens@textaxlaw.com
Texas Bar No. 13050720
**Lacy L. Leonard**
lleonard@textaxlaw.com
Texas Bar No. 24040561
**Amanda G. Taylor**
ataylor@textaxlaw.com
Texas Bar No. 24045921
**Danielle V. Ahlrich**
dahlrich@textaxlaw.com
Texas Bar No. 24059215
Martens, Todd, Leonard & Taylor
301 Congress Ave., Ste. 1950
Austin, TX 78701
(512) 542-9898 – Telephone
(512) 542-9899 – Fax

Attorneys for the Plaintiff

**Charles K. Eldred**
Charles.Eldred@texasattorneygeneral.gov
Texas Bar No. 00793681
**Erika R. Sams**
Erika.Sams@texasattorneygeneral.gov
Texas Bar No. 24083784
Assistant Attorney General
Financial and Tax Litigation Division
P.O. Box 12548
Austin, TX 78711-2548
(512) 463-8897 – Telephone
(512) 457-4423 – Fax

Attorneys for the Defendants

*CGGVeritas Services (U.S.) Inc. v. Combs, et al.*
Findings of Fact and Conclusions of Law
Page 6 of 6

270

C



**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 3. Legislative Branch (Refs & Annos)
      Subtitle B. Legislation
        ⌐▤ Chapter 311. Code Construction Act (Refs & Annos)
          ⌐▤ Subchapter C. Construction of Statutes (Refs & Annos)
            ➡➡ **§ 311.021. Intention in Enactment of Statutes**

In enacting a statute, it is presumed that:

  (1) compliance with the constitutions of this state and the United States is intended;

  (2) the entire statute is intended to be effective;

  (3) a just and reasonable result is intended;

  (4) a result feasible of execution is intended; and

  (5) public interest is favored over any private interest.

CREDIT(S)

Acts 1985, 69th Leg., ch. 479, § 1, eff. Sept. 1, 1985.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

D



**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
 Government Code (Refs & Annos)
  Title 4. Executive Branch (Refs & Annos)
   Subtitle A. Executive Officers (Refs & Annos)
    ⌐▤ Chapter 403. Comptroller of Public Accounts
     ⌐▤ Subchapter J. Suits by Persons Owing Taxes or Fees
      ➡➡ **§ 403.203. Protest Payment Suit After Payment Under Protest**

(a) A person may bring suit against the state to recover an occupation, excise, gross receipts, franchise, license, or privilege tax or fee covered by this subchapter and required to be paid to the state if the person has first paid the tax under protest as required by Section 403.202.

(b) A suit under this section must be brought before the 91st day after the day the protest payment was made, or the suit is barred; provided that with respect to any tax or fee assessed annually but that is required to be paid in installments, the protest required by Section 403.202 may be filed with the final annual return and suit for the recovery for any such installment may be filed within 90 days after the final annual return is due.

(c) The state may bring a counterclaim in a suit brought under this section if the counterclaim relates to taxes or fees imposed under the same statute and during the same period as the taxes or fees that are the subject of the suit and if the counterclaim is filed not later than the 30th day before the date set for trial on the merits of the suit. The state is not required to make an assessment of the taxes or fees subject to the counterclaim under any other statute, and the period of limitation applicable to an assessment of the taxes or fees does not apply to a counterclaim brought under this subsection.

CREDIT(S)

Added by Acts 1989, 71st Leg., ch. 232, § 24, eff. Sept. 1, 1989. Amended by Acts 1993, 73rd Leg., ch. 486, § 7.10, eff. Sept. 1, 1993.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

E



**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle B. Enforcement and Collection (Refs & Annos)
        Chapter 112. Taxpayers' Suits (Refs & Annos)
          Subchapter B. Suit After Protest Payment (Refs & Annos)
            **§ 112.051. Protest Payment Required**

(a) If a person who is required to pay a tax or fee imposed by this title or collected by the comptroller under any law, including a local tax collected by the comptroller, contends that the tax or fee is unlawful or that the public official charged with the duty of collecting the tax or fee may not legally demand or collect the tax or fee, the person shall pay the amount claimed by the state, and if the person intends to bring suit under this subchapter, the person must submit with the payment a protest.

(b) The protest must be in writing and must state fully and in detail each reason for recovering the payment.

(c) The protest payment must be made within the period of time set out in Subdivision (3) of Subsection (c) of Section 111.104 of this code for the filing of refund claims.

CREDIT(S)

Acts 1981, 67th Leg., p. 1512, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1983, 68th Leg., p. 460, ch. 94, § 6, eff. May 10, 1983; Acts 1989, 71st Leg., ch. 232, § 4, eff. Sept. 1, 1989.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

F



**Effective: January 1, 2014**

Vernon's Texas Statutes and Codes Annotated Currentness
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment
            **§ 171.101. Determination of Taxable Margin**

(a) The taxable margin of a taxable entity is computed by:

  (1) determining the taxable entity's margin, which is the lesser of:

    (A) the amount provided by this paragraph, which is the lesser of:

      (i) 70 percent of the taxable entity's total revenue from its entire business, as determined under Section 171.1011; or

      (ii) an amount equal to the taxable entity's total revenue from its entire business as determined under Section 171.1011 minus $1 million; or

    (B) an amount computed by determining the taxable entity's total revenue from its entire business under Section 171.1011 and subtracting the greater of:

      (i) $1 million; or

      (ii) an amount equal to the sum of:

        (a) at the election of the taxable entity, either:

          (1) cost of goods sold, as determined under Section 171.1012; or

          (2) compensation, as determined under Section 171.1013; and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) any compensation, as determined under Section 171.1013, paid to an individual during the period the individual is serving on active duty as a member of the armed forces of the United States if the individual is a resident of this state at the time the individual is ordered to active duty and the cost of training a replacement for the individual;

(2) apportioning the taxable entity's margin to this state as provided by Section 171.106 to determine the taxable entity's apportioned margin; and

(3) subtracting from the amount computed under Subdivision (2) any other allowable deductions to determine the taxable entity's taxable margin.

(b) Notwithstanding Subsection (a)(1)(B)(ii)(a), a professional employer organization may subtract only the greater of $1 million as provided by Subsection (a)(1)(B)(i) or compensation as determined under Section 171.1013.

(c) In making a computation under this section, an amount that is zero or less is computed as a zero.

(d) An election under Subsection (a)(1)(B)(ii) shall be made by the taxable entity on its annual report and is effective only for that annual report. A taxable entity shall notify the comptroller of its election not later than the due date of the annual report.

CREDIT(S)

Acts 1981, 67th Leg., p. 1697, ch. 389, § 1, eff. Jan. 1, 1982. Amended by Acts 1991, 72nd Leg., ch. 901, § 53(b), eff. Aug. 26, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 8.05, eff. Jan. 1, 1992; Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008; Acts 2007, 80th Leg., ch. 1282, § 11, eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 117 (S.B. 1286), § 24, eff. Sept. 1, 2013; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 6, eff. Jan. 1, 2014.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

G



**Effective: September 1, 2013**

Vernon's Texas Statutes and Codes Annotated Currentness
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment
            **§ 171.1012. Determination of Cost of Goods Sold**

(a) In this section:

(1) "Goods" means real or tangible personal property sold in the ordinary course of business of a taxable entity.

(2) "Production" includes construction, installation, manufacture, development, mining, extraction, improvement, creation, raising, or growth.

(3)(A) "Tangible personal property" means:

(i) personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner;

(ii) films, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator or any one or more third parties in a form that is not substantially altered; and

(iii) a computer program, as defined by Section 151.0031.

(B) "Tangible personal property" does not include:

(i) intangible property; or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(ii) services.

(b) Subject to Section 171.1014, a taxable entity that elects to subtract cost of goods sold for the purpose of computing its taxable margin shall determine the amount of that cost of goods sold as provided by this section.

(c) The cost of goods sold includes all direct costs of acquiring or producing the goods, including:

(1) labor costs;

(2) cost of materials that are an integral part of specific property produced;

(3) cost of materials that are consumed in the ordinary course of performing production activities;

(4) handling costs, including costs attributable to processing, assembling, repackaging, and inbound transportation costs;

(5) storage costs, including the costs of carrying, storing, or warehousing property, subject to Subsection (e);

(6) depreciation, depletion, and amortization, reported on the federal income tax return on which the report under this chapter is based, to the extent associated with and necessary for the production of goods, including recovery described by Section 197, Internal Revenue Code;

(7) the cost of renting or leasing equipment, facilities, or real property directly used for the production of the goods, including pollution control equipment and intangible drilling and dry hole costs;

(8) the cost of repairing and maintaining equipment, facilities, or real property directly used for the production of the goods, including pollution control devices;

(9) costs attributable to research, experimental, engineering, and design activities directly related to the production of the goods, including all research or experimental expenditures described by Section 174, Internal Revenue Code;

(10) geological and geophysical costs incurred to identify and locate property that has the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

potential to produce minerals;

(11) taxes paid in relation to acquiring or producing any material, or taxes paid in relation to services that are a direct cost of production;

(12) the cost of producing or acquiring electricity sold; and

(13) a contribution to a partnership in which the taxable entity owns an interest that is used to fund activities, the costs of which would otherwise be treated as cost of goods sold of the partnership, but only to the extent that those costs are related to goods distributed to the taxable entity as goods-in-kind in the ordinary course of production activities rather than being sold.

(d) In addition to the amounts includable under Subsection (c), the cost of goods sold includes the following costs in relation to the taxable entity's goods:

(1) deterioration of the goods;

(2) obsolescence of the goods;

(3) spoilage and abandonment, including the costs of rework labor, reclamation, and scrap;

(4) if the property is held for future production, preproduction direct costs allocable to the property, including costs of purchasing the goods and of storage and handling the goods, as provided by Subsections (c)(4) and (c)(5);

(5) postproduction direct costs allocable to the property, including storage and handling costs, as provided by Subsections (c)(4) and (c)(5);

(6) the cost of insurance on a plant or a facility, machinery, equipment, or materials directly used in the production of the goods;

(7) the cost of insurance on the produced goods;

(8) the cost of utilities, including electricity, gas, and water, directly used in the production of the goods;

(9) the costs of quality control, including replacement of defective components pursuant to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

standard warranty policies, inspection directly allocable to the production of the goods, and repairs and maintenance of goods; and

(10) licensing or franchise costs, including fees incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right directly associated with the goods produced.

(e) The cost of goods sold does not include the following costs in relation to the taxable entity's goods:

(1) the cost of renting or leasing equipment, facilities, or real property that is not used for the production of the goods;

(2) selling costs, including employee expenses related to sales;

(3) distribution costs, including outbound transportation costs;

(4) advertising costs;

(5) idle facility expense;

(6) rehandling costs;

(7) bidding costs, which are the costs incurred in the solicitation of contracts ultimately awarded to the taxable entity;

(8) unsuccessful bidding costs, which are the costs incurred in the solicitation of contracts not awarded to the taxable entity;

(9) interest, including interest on debt incurred or continued during the production period to finance the production of the goods;

(10) income taxes, including local, state, federal, and foreign income taxes, and franchise taxes that are assessed on the taxable entity based on income;

(11) strike expenses, including costs associated with hiring employees to replace striking personnel, but not including the wages of the replacement personnel, costs of security, and legal fees associated with settling strikes;

(12) officers' compensation;

(13) costs of operation of a facility that is:

(A) located on property owned or leased by the federal government; and

(B) managed or operated primarily to house members of the armed forces of the United States; and

(14) any compensation paid to an undocumented worker used for the production of goods. As used in this subdivision:

(A) "undocumented worker" means a person who is not lawfully entitled to be present and employed in the United States; and

(B) "goods" includes the husbandry of animals, the growing and harvesting of crops, and the severance of timber from realty.

(f) A taxable entity may subtract as a cost of goods sold indirect or administrative overhead costs, including all mixed service costs, such as security services, legal services, data processing services, accounting services, personnel operations, and general financial planning and financial management costs, that it can demonstrate are allocable to the acquisition or production of goods, except that the amount subtracted may not exceed four percent of the taxable entity's total indirect or administrative overhead costs, including all mixed service costs. Any costs excluded under Subsection (e) may not be subtracted under this subsection.

(g) A taxable entity that is allowed a subtraction by this section for a cost of goods sold and that is subject to Section 263A, 460, or 471, Internal Revenue Code, may capitalize that cost in the same manner and to the same extent that the taxable entity capitalized that cost on its federal income tax return or may expense those costs, except for costs excluded under Subsection (e), or in accordance with Subsections (c), (d), and (f). If the taxable entity elects to capitalize costs, it must capitalize each cost allowed under this section that it capitalized on its federal income tax return. If the taxable entity later elects to begin expensing a cost that may be allowed under this section as a cost of goods sold, the entity may not deduct any cost in ending inventory from a previous report. If the taxable entity elects to expense a cost of goods sold that may be allowed under this section, a cost incurred before the first day of the period on which the report is based may not be subtracted as a cost of goods sold. If the taxable entity elects to expense a cost of goods sold and later elects to capitalize that cost of goods sold, a cost expensed on a previous report may not be capitalized.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(h) A taxable entity shall determine its cost of goods sold, except as otherwise provided by this section, in accordance with the methods used on the federal income tax return on which the report under this chapter is based. This subsection does not affect the type or category of cost of goods sold that may be subtracted under this section.

(i) A taxable entity may make a subtraction under this section in relation to the cost of goods sold only if that entity owns the goods. The determination of whether a taxable entity is an owner is based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxable entity. A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance (as the term "maintenance" is defined in 34 T.A.C. Section 3.357) of real property is considered to be an owner of that labor or materials and may include the costs, as allowed by this section, in the computation of cost of goods sold. Solely for purposes of this section, a taxable entity shall be treated as the owner of goods being manufactured or produced by the entity under a contract with the federal government, including any subcontracts that support a contract with the federal government, notwithstanding that the Federal Acquisition Regulation may require that title or risk of loss with respect to those goods be transferred to the federal government before the manufacture or production of those goods is complete.

(j) A taxable entity may not make a subtraction under this section for cost of goods sold to the extent the cost of goods sold was funded by partner contributions and deducted under Subsection (c)(13).

(k) Notwithstanding any other provision of this section, if the taxable entity is a lending institution that offers loans to the public and elects to subtract cost of goods sold, the entity, other than an entity primarily engaged in an activity described by category 5932 of the 1987 Standard Industrial Classification Manual published by the federal Office of Management and Budget, may subtract as a cost of goods sold an amount equal to interest expense. For purposes of this subsection, an entity engaged in lending to unrelated parties solely for agricultural production offers loans to the public.

(k-1) Notwithstanding any other provision of this section, the following taxable entities may subtract as a cost of goods sold the costs otherwise allowed by this section in relation to tangible personal property that the entity rents or leases in the ordinary course of business of the entity:

   (1) a motor vehicle rental or leasing company that remits a tax on gross receipts imposed under Section 152.026;

   (2) a heavy construction equipment rental or leasing company; and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(3) a railcar rolling stock rental or leasing company.

(k-2) This subsection applies only to a pipeline entity: (1) that owns or leases and operates the pipeline by which the product is transported for others and only to that portion of the product to which the entity does not own title; and (2) that is primarily engaged in gathering, storing, transporting, or processing crude oil, including finished petroleum products, natural gas, condensate, and natural gas liquids, except for a refinery installation that manufactures finished petroleum products from crude oil. Notwithstanding Subsection (e)(3) or (i), a pipeline entity providing services for others related to the product that the pipeline does not own and to which this subsection applies may subtract as a cost of goods sold its depreciation, operations, and maintenance costs allowed by this section related to the services provided.

(k-3) For purposes of Subsection (k-2), "processing" means the physical or mechanical removal, separation, or treatment of crude oil, including finished petroleum products, natural gas, condensate, and natural gas liquids after those materials are produced from the earth. The term does not include the chemical or biological transformation of those materials.

(l) Notwithstanding any other provision of this section, a payment made by one member of an affiliated group to another member of that affiliated group not included in the combined group may be subtracted as a cost of goods sold only if it is a transaction made at arm's length.

(m) In this section, "arm's length" means the standard of conduct under which entities that are not related parties and that have substantially equal bargaining power, each acting in its own interest, would negotiate or carry out a particular transaction.

(n) In this section, "related party" means a person, corporation, or other entity, including an entity that is treated as a pass-through or disregarded entity for purposes of federal taxation, whether the person, corporation, or entity is subject to the tax under this chapter or not, in which one person, corporation, or entity, or set of related persons, corporations, or entities, directly or indirectly owns or controls a controlling interest in another entity.

(o) If a taxable entity, including a taxable entity with respect to which cost of goods sold is determined pursuant to Section 171.1014(e)(1), whose principal business activity is film or television production or broadcasting or the distribution of tangible personal property described by Subsection (a)(3)(A)(ii), or any combination of these activities, elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described in this section in relation to the property and include depreciation, amortization, and other expenses directly related to the acquisition, production, or use of the property, including expenses for the right to broadcast or use the property.

(p) to (s) [Blank].

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(t) If a taxable entity that is a movie theater elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described by this section in relation to the acquisition, production, exhibition, or use of a film or motion picture, including expenses for the right to use the film or motion picture.

CREDIT(S)

Added by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008. Amended by Acts 2007, 80th Leg., ch. 1282, §§ 14, 15, eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 9, eff. Jan. 1, 2014; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 10(a), eff. Sept. 1, 2013.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT